Richard C. CHATMAN and James Huffman, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED STATES STEEL CORPORATION et al., Defendants.

No. C–75–1239–CBR.

United States District Court,
N. D. California.

Jan. 24, 1977.

Nancy Scott Ince, Lowell Johnston, William Bennett Turner, William E. Hickman, San Francisco, Cal., for plaintiffs.

McCutchen, Doyle, Brown & Enersen, David M. Heilbron, Jonathan H. Sakol, San Francisco, Cal., S. G. Clark, Jr., Gen. Atty., Labor, U. S. Steel Corp., Pittsburgh, Pa., for U. S. Steel Corp.

Carl B. Frankel, Pittsburgh, Pa., H. Tim Hoffman, Hoffman & Associates, Oakland, Cal., for Local 1440, United Steelworkers of America, AFL–CIO.

## ORDER GRANTING SUMMARY JUDGMENT

RENFREW, District Judge.

This is an action for employment discrimination brought by Richard C. Chatman ("Chatman") and James Huffman ("Huffman"), two black employees at United States Steel Corporation's Pittsburg Works, located in Pittsburg, California. Defendants are United States Steel Corporation ("U.S. Steel" or "Company") and United Steelworkers of America, AFL–CIO, and its Local 1440 ("Union").

Plaintiffs allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1] They seek broad-based systemic declaratory and injunctive relief as well as back pay, punitive damages, attorneys' fees, and costs.

The action was filed on the heels of a comprehensive Consent Decree entered into by the United States on behalf of various governmental agencies, including the Justice Department, the Labor Department, and the Equal Employment Opportunity Commission.[2] Parties to the Consent De-

---

1. On September 25, 1975, this Court dismissed plaintiff Huffman's Title VII claims against U.S. Steel and the Title VII claims of both plaintiffs against the Union.

2. The Consent Decree was approved by the United States District Court for the Northern District of Alabama on April 12, 1974. The District Court's decision was affirmed by the

cree include the United Steelworkers of America and nine major steel producers, among them U.S. Steel.

The Consent Decree enjoins the companies from engaging in any form of employment discrimination; restructures seniority rules; outlines procedures for transfer, promotion, layoff and recall; establishes a back-pay fund of $30,940,000; and sets out affirmative action guidelines, requiring the implementation of affirmative action programs including training and minority recruitment. In addition, the Decree establishes elaborate mechanisms for monitoring implementation and ensuring compliance at each of the some 250 covered facilities, among them U.S. Steel's Pittsburg Works.

Pursuant to the Consent Decree, back pay checks were tendered to numerous minority employees of the nine covered steel producers, including 226 black employees at U.S. Steel's Pittsburg Works. Those who accepted the back pay tender thereby released all claims of discrimination that might otherwise have been asserted against their employers or union. Of the 226 black employees at the Pittsburg Works eligible for back pay, all but 11 accepted the tendered pay and released their claims.

Plaintiffs nonetheless sought initially to maintain this suit as a class action, claiming to represent "all black persons who are employed or might be employed by defendant United States Steel Corporation at its facilities in Pittsburg, California, who have been and continue to be or might be adversely affected by the practices complained of herein, and who have been, are, or might be represented by defendant labor organizations." Complaint at ¶ 5. However, plaintiffs filed no brief in support of their motion for class certification and ultimately withdrew the motion in open court on October 7, 1976, the date set for oral argument.

Asserting that plaintiffs' claims "are founded on garden-variety grievances having nothing to do with race" (Memorandum of Points and Authorities in Support of Motion for Summary Judgment at p. 4), defendants moved for summary judgment on September 9, 1976. In essence defendants argue that all of the allegedly discriminatory acts complained of by Chatman resulted from the application of neutral rules and regulations equally applicable to employees of other races. Defendants further assert that Huffman's claim has nothing to do with race and is, in any event, barred by the applicable statute of limitations.

## SUMMARY JUDGMENT WITH RESPECT TO CHATMAN'S CLAIMS

In his complaint of June 16, 1975, Chatman alleges that he was discriminated against because of his race on twelve separate occasions. Proceeding chronologically, the Court will consider in turn the factual material adduced by plaintiffs and defendants concerning each separate allegation. In accordance with Rule 56 of the Federal Rules of Civil Procedure, defendant's motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact   *   *   *."

Chatman first claims to have been discriminated against on the basis of race on June 22, 1973, when he was assigned two or three graveyard shifts in a row.

Defendants contend that this incident resulted from the application of a neutral policy in force throughout the plant. In support defendants offer the affidavit of Personnel Superintendent Robert A. Benson who states that Chatman was assigned to the first of two successive graveyard shifts as part of his normal shift rotation. On the date in question Chatman was employed as a "Piler," a job which is one step below that of Basement Attendant on the relevant line of progression. When an employee with greater seniority than Chatman returned

Court of Appeals for the Fifth Circuit on August 18, 1975. *See United States v. Allegheny-*

*Ludlum Industries, Inc.,* 517 F.2d 826 (5 Cir. 1975).

from vacation, he displaced the least senior Basement Attendant who in turn displaced Chatman, the least senior Piler. Chatman was consequently "bumped back" to the position of Tractor Operator on a crew which had just rotated onto the graveyard shift.

The rule that a returning employee at one job level displaces the least senior employee at the level immediately below is employed throughout U.S. Steel's Pittsburg Works to minimize the number of displacements required in a move-down situation. According to affiant Benson, this policy, which occasionally results in successive assignments to the same shift, is applied evenhandedly to all employees regardless of race.

In opposition to defendants' motion for summary judgment, plaintiff has produced no fact tending to controvert the explanation contained in the Benson affidavit.

Chatman claims to have been discriminated against on the basis of race when bids posted on October 9, 1974, for vacancies to be filled at a later date, were cancelled after the bidding.

According to Robert Benson's affidavit of September 8, 1976, bids for two of the positions were cancelled because the vacancies no longer existed. Ten non-black bidders were also adversely affected by the cancellation. Moreover, the bids would doubtless have been awarded to some among the many bidders with earlier plant continuous service dates than Chatman, had they not been cancelled. None of these facts has been controverted by plaintiff, hence no disputed issue remains for trial.

Chatman claims to have been discriminated against on the basis of race in November, 1974, when he bid for the position of Attendant at the nine crew level. Although he was posted as having received the bid, the plant failed to go to the nine crew level of operation and the bid was voided.

According to facts contained in Robert Benson's affidavit and nowhere contradicted by plaintiff, the nine crew level was never reached because of adverse economic conditions. Consequently all successful bidders at the nine crew level had their bids voided, in conformance with established plant procedure. As plaintiff Chatman conceded in deposition testimony (Chatman Deposition at pp. 23–24), employees of all races were affected by the cancellation.

Chatman claims to have been discriminated against on the basis of race because, in November, 1974, he was not permitted to move to temporary openings on another line. At that time Chatman was working as a Piler on Number 3 line, and the Number 3 line was shearing.

According to affiant Benson, Chatman was not permitted to move up to temporary openings on other lines for one reason. Under established move-up policy in force throughout the Ferrostan Department, the Piler assigned to the Number 3 line must perform the piling function if the Number 3 line is shearing, as it was on the dates in question. This policy resulted from a Company-Union agreement worked out in 1968 and subsequently updated in 1972. According to information contained in the Benson affidavit, Pilers of all races have lost move-ups due to its application. Plaintiff Chatman has produced nothing in opposition to defendants' motion suggesting that, on the dates in question, move-ups were denied him because of his race, rather than his position.

On a second occasion in November, 1974, Chatman claims that he was discriminated against when he was not permitted to move up, within Number 3 line, from the position of Piler to that of Assistant Operator. In this instance, defendants concede that the policy precluding Pilers from moving to vacancies on other lines was not applicable. According to affiant Benson, Chatman was not awarded the move-up he sought because, as Piler, he was three positions below Assistant Operator in the promotional sequence and thoroughly unfamiliar with the job.

By way of opposition, Chatman does not dispute defendants' allegation that he had no training for the position he sought. He

states, however, that a white worker named Stephens was, with the help of his foreman, allowed to move up from Feeder to Operator on one isolated occasion in 1974. According to Chatman's affidavit of September 28, 1976, Stephens "was not familiar with the job, but the foreman on the line, Berg, set the shear cut and assisted Stephens throughout the turn in doing the Operator's job so that Stephens earned Operator's pay with the help of his foreman." Chatman Affidavit at Par. 3.

With regard to this incident, Chatman's affidavit testimony is insufficient to withstand defendants' motion for summary judgment. That a generous foreman on a single occasion went out of his way to help a white employee train for a higher position does not, in itself, raise the spectre of race discrimination. A trier of fact would not be justified in concluding, based on this single incident, that Chatman was denied the three position move-up he sought because of his race.

It may be that no one was available to assist Chatman in training on the job for the position of Assistant Operator. Whatever the explanation, the evidence before the Court clearly suggests that a three position move-up is the exception rather than the rule at U.S. Steel's Pittsburg Works, and that Chatman received standard treatment when he sought to leapfrog upward in the promotional sequence.

Chatman claims to have been discriminated against on the basis of race because he was given a safety violation warning on November 12, 1974. That Chatman committed the safety violation is not itself in dispute. In deposition testimony, Chatman admitted that he failed to wear his hard hat and wristlets on the date in question. Moreover, Chatman conceded that he had no reason to believe he had received more safety warnings than employees of other races. Chatman Deposition at p. 137.

According to information contained in Robert Benson's affidavit and nowhere contradicted by plaintiff, safety warnings are issued on a nondiscriminatory basis to all employees who commit infractions. Company records show that during 1974, blacks employed in Chatman's own seniority unit received safety citations with approximately the same statistical frequency as white and Spanish-surnamed employees. The Court finds no indication that Chatman received a citation on November 12, 1974, because of his race.

Chatman claims to have been discriminated against on the basis of race on November 29, 1974, when a vacancy sought by Chatman was not put up for bid. In this instance Harrison, a Finisher on Chatman's crew, fell ill and went on sick leave following a vacation.

According to affiant Benson, the entire crew moved up according to seniority level on this occasion, each vacancy being filled by the most senior employee in the position immediately below. Thus, although the Harrison vacancy was not put up for bid, each employee progressed upward in the promotional sequence according to plant continuous service date, as was proper in such a situation. Company records show that on this occasion, Chatman actually moved up to the position to which he claims he was entitled, namely that of Electrolytic Attendant.

Chatman claims to have been discriminated against on the basis of race because of the manner in which incentive rates were applied to him in January, 1975, when he was working as a tractor driver. Instead of separately evaluating the performance of each individual driver for purposes of determining whether incentive pay was merited, the performance of all drivers was evaluated together.

According to affidavits submitted by defendants, all tractor drivers were treated in the manner described by Chatman regardless of racial background. Chatman himself admitted as much in deposition testimony. Chatman Deposition at pp. 69, 73. The basis upon which Chatman rests his claim of race discrimination is, in this instance, obscure.

Chatman claims to have been discriminated against on the basis of race in February, 1975, when he was paid as a laborer al-

though scheduled as a Tractor/Laborer. According to defendants' affidavits, Tractor/Laborers do not always perform tractor service and are paid according to the work actually performed. In this instance company records show that Chatman in fact worked and *was paid* as a Tractor Operator. Chatman stated that he didn't know what wage he had received. Chatman Deposition at p. 84. In sum, no evidence has been adduced which tends to show that Chatman received a lower wage on this occasion than that to which he was entitled.

Chatman claims to have been discriminated against on the basis of race on February 22, 1975, when an Operator on his line was at the doctor's and the entire crew worked short-handed, instead of each employee moving up along the promotional ladder temporarily. Clearly, all employees in Chatman's crew, whatever their race, were adversely affected by the foreman's decision to work short-handed. Moreover, affiant Benson testified that the foreman could not have required the crew to work short-handed without the concurrence of all affected employees.

Chatman claims to have been discriminated against on the basis of race because of the vacation schedule he received in 1975. According to Chatman, Orozco, an employee carrying over vacation credits from the previous year was given priority over him in vacation scheduling. Garcia, a second employee ahead of Chatman in the promotional sequence, was given a vacation which overlapped Chatman's own vacation, allegedly in order to prevent Chatman from moving up to fill the vacancy created when Garcia left.

According to defendants' affidavits, company records show that Orozco was not, in fact, given priority over Chatman in vacation scheduling. Chatman's allegation respecting Garcia's vacation is also contradict-

ed by company records, since Garcia's six-week vacation overlapped Chatman's vacation by only two weeks. During the four-week period when Garcia was on leave and Chatman was working, Chatman could theoretically have moved up to fill the Garcia vacancy, assuming he was the most qualified bidder for the opening. No evidence adduced by Chatman suggests that race discrimination accounted for the manner in which vacations were scheduled in 1975.

Chatman claims to have been discriminated against on the basis of race on July 22, 1975, when he was not permitted to move to a temporary vacancy on another shift.

According to defendants' affidavits, a longstanding company rule applicable to all races equally provides that, wherever possible, a temporary vacancy on one shift is filled by an employee working that same shift. Temporary move-ups within a shift are thus the rule and move-ups between shifts exceptional.

By way of opposition, Chatman cites a single instance in which a white worker named Gibson was permitted to move up from the swing to the graveyard shift. Chatman Affidavit of September 28, 1976, at Par. 7. However, defendants' affidavits suggest that Gibson's situation was quite different from Chatman's. Chatman sought a temporary move-up in a non-bid situation, hence the rule barring inter-shift move-ups applied. By contrast, Gibson sought a four-week move-up to a position on which he held a standing bid. The rule, which bars only *temporary* inter-shift move-ups, was therefore inapplicable.

Even if Gibson had been permitted a temporary move-up between shifts, a single isolated incident is insufficient to state a claim of race discrimination.[3]

Finally, Chatman claims he was discriminated against on the basis of race in Octo-

---

**3.** *See, e. g., Robinson v. City of Dallas,* 514 F.2d 1271 (5 Cir. 1975), in which the court noted that "three of the five employees disciplined under the 'just debts' rule have been black. We are unable to conclude, on the basis of these few instances of discipline, that the 'just debts' rule has a harsher effect on blacks than

whites. Such small numbers are insufficient to support any conclusion as to whether the rule has a discriminatory effect. See Note, Employment Discrimination: Statistics and Preferences Under Title VII, 59 Va.L.Rev. 463, 478 (1973)." 514 F.2d at 1273.

ber, 1975, when a plant-wide work force reduction resulted in his being "bumped back" to the position of janitor. According to affiant Benson, numerous other employees were also "cut back" from their seniority units and reassigned to jobs in the labor pool as a result of the overall work force reduction. In deposition testimony, Chatman himself conceded that employees of all races were adversely affected by the cutbacks. Chatman Deposition at p. 78.

Prior to 1974, the reduction in force provisions of the Local Seniority Agreement provided that employees would be displaced from their seniority units on the basis of department continuous service. The Agreement was updated in 1974 to satisfy the terms of the Consent Decree, which substituted plant continuous service for department continuous service as a measure of seniority.

According to defendants' affidavits, it was on the basis of plant continuous service that all employees were "cut back" in the fall of 1975. With the relatively recent plant continuous service date of September 14, 1964, Chatman was among those displaced during the reduction. Although Chatman claims that several less senior employees were not displaced, he fails to support that allegation with concrete facts. No evidence has been proffered suggesting that Chatman, or any other black employee, was displaced on the basis of race rather than plant seniority.

With respect to each of his numerous allegations, the Court concludes that Chatman has failed to demonstrate a causal nexus between his race and the treatment he received from defendants. In order to state an actionable claim of discrimination, it is essential that plaintiff show that he has been treated differently than other employees because of his race. If he has been treated no differently than employees of other races, however unfair he regards the treatment and whatever claim he might have under a collective bargaining agreement, he has no claim of discrimination.

In support of their motion for summary judgment, defendants have produced affidavit testimony demonstrating that in each instance cited by Chatman, the treatment received resulted from an even-handed application of neutral principles applicable to all employees regardless of race. Chatman has failed to rebut the material facts contained in defendants' affidavits. Inasmuch as no material issues remains in dispute, the Court concludes that summary judgment is an entirely appropriate vehicle for disposing of Chatman's claims at this juncture.

## SUMMARY JUDGMENT WITH RESPECT TO HUFFMAN'S CLAIM

Huffman first went to work at U.S. Steel's Pittsburg Works in July of 1964. Initially he was assigned to the labor pool in the Cold Reduction Department, where he worked for less than a week before being laid off. When he was recalled from layoff, Huffman was assigned to another department. Although he was technically entitled to seniority rights in Cold Reduction, his name was mistakenly omitted from the Department's seniority list and he was not recalled to Cold Reduction.

Through a series of transfers, Huffman finally returned to Cold Reduction in January, 1967. Only then did he learn that a mistake had been made some two and a half years before concerning his proper seniority. Seeking to regain his rightful position in Cold Reduction, Huffman filed a formal grievance in 1967. The grievance progressed through four procedural stages and was finally referred to arbitration. Just prior to its submission to the arbitrator in 1968, the Union reached an agreement with the Company and the grievance was settled. It is that settlement that Huffman now attacks as discriminatory.

The situation which gave rise to Huffman's grievance was highly problematic insofar as two and a half years had elapsed between July, 1964, when Huffman's name was wrongly omitted from the seniority list, and January, 1967, when the error came to light.

Had Huffman been properly recalled to Cold Reduction in 1964, he would likely have moved upward through one of the

Department's several lines of job progression, bidding for openings as they became available. Since vacancies had opened up between 1964 and 1967 in the Roll Shop, the Cold Reduction Mills, the Cleaning Line and Batch Annealing, it was impossible to determine where Huffman should have been in the promotional sequence.

Faced with a highly complex problem, the resolution of which would affect many employees besides Huffman himself, the Union reached a settlement by assigning Huffman, somewhat arbitrarily, the job of Tractor Operator in the Roll Shop line of progression. Huffman was also awarded an arbitrary job seniority date which provided him with a fair measure of security in his new position. Characterizing the settlement as discriminatory, Huffman contends he ought to have been awarded the job of Roll Grinder, which is one step above that of Tractor Operator in the relevant line of progression.

In support of their motion for summary judgment, defendants have filed numerous affidavits wherein individuals who participated in the settlement of the Huffman grievance state that Huffman's situation was, in their experience, unique.

Personnel Superintendent Robert Benson stated that he reviewed the Company's records of grievances filed at the plant between 1965 and 1968 and could find no record of a comparable grievance. Benson Affidavit of September 8, 1976, at ¶ 17. Max B. Pope, who participated in the settlement of Huffman's grievance in his role as General Supervisor—Labor Relations for U.S. Steel's Pittsburg Works stated that the Huffman grievance was absolutely unique. The affidavits of grievance man James Manau and Union representative Carl Jones are to similar effect. All the affiants aver that a good-faith effort was made to resolve an unprecedented and highly complex problem in the fairest manner possible, and that the settlement ultimately reached had nothing to do with Huffman's race.

In support of his contention that the settlement reached was not simply unfair but actually discriminatory, plaintiff Huffman relies on the single allegation that a white worker received more favorable treatment in a comparable situation. In his affidavit of September 28, 1976, filed in opposition to defendants' motion for summary judgment, Huffman refers to a white employee described only as "Tim or Timothy." According to Huffman, that employee was working in the Rod Mill in 1965 or 1966 when he learned that his proper seniority was in Sheet Finishing. Upon his recall to Sheet Finishing, the white employee was, according to Huffman, restored to his "rightful" position as Piler, thereby displacing Huffman himself. Huffman Affidavit of September 28, 1976, at ¶ 4.

■ Without more, Huffman's allegation is simply insufficient to withstand defendants' motion for summary judgment. Huffman stakes his entire claim of discrimination upon the allegedly differential treatment accorded a white employee in a similar situation. However, the paucity of facts adduced concerning this white employee's experience would seem to preclude Huffman from drawing any valid inference that the two situations were truly comparable. For instance, Huffman characterizes the settlement of his own grievance as discriminatory but states in his affidavit that he cannot recall "whether this white worker had to go through grievance procedures" himself. Huffman Affidavit of September 28, 1976, at ¶ 4.

Even accepting as true Huffman's allegation that a white worker received more favorable treatment under comparable circumstances, that allegation is insufficient to state a claim of race discrimination. Based on this single incident, a trier of fact would not be warranted in concluding that race was responsible for the treatment Huffman received. In order to establish a credible nexus between Huffman's race and the manner in which his grievance was compromised, more is required than an unsupported allegation concerning one other employee's experience on a single occasion.

In any event, Huffman's claim, whatever its merits, is effectively barred by the applicable statute of limitations.

It is now well established that the statute of limitations for actions asserted under 42 U.S.C. § 1981 is the most nearly analogous state period of limitations. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1974). The most nearly applicable California statutes prescribe limitation periods not exceeding four years. *Griffin v. Pacific Maritime Association,* 478 F.2d 1118, 1119 (9 Cir. 1973), *cert. denied,* 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973).[4]

Huffman commenced this action on June 16, 1975. The grievance settlement about which he complains was executed on May 16, 1968, some seven years before.

Seeking to forestall application of the statute of limitations, plaintiff construes the settlement of his grievance as a "continuing" act of discrimination. According to plaintiff's argument, the settlement of his grievance improperly left him behind two other employees, Jiminez and Rucquoy, in the promotional sequence. In the event of a work force reduction, Huffman claims he will be "bumped back" to an inferior position before these two employees who, he claims, should properly be displaced before him. That, in essence, is the "continuing" effect which Huffman ascribes to the settlement.

If Huffman's contention were correct, the effect of the settlement would continue into perpetuity. The statute of limitations would never operate as a bar to the action, even though the incident about which Huffman complains was a discrete event the effects of which were fully apparent in 1968.

In *Griffin v. Pacific Maritime Association, supra,* a group of minority longshoremen de-registered by their union in 1946 and reinstated only years afterward advanced a "continuing discrimination" argument, seeking to overcome the barrier posed by the statute of limitations. The court rejected out of hand plaintiffs' con-

tention that the allegedly discriminatory de-registration had a "continuing" effect, insofar as the resultant loss of credit toward seniority, pension benefits, and the like continued to affect the plaintiffs' years after reinstatement. 478 F.2d at 1120.

In response to a similar "continuing discrimination" argument advanced by plaintiffs in *Kennedy v. Braniff Airways, Inc.,* 403 F.Supp. 707, 709 (N.D.Tex. 1975), the court stated:

> "The problem with the plaintiffs' position is that it proves too much. Virtually any violation may be construed as a continuing one. [Citations omitted.] For example, a refusal to hire may be characterized as an act that continues until the person is hired; the same may be said for the refusal to promote. The doctrine, if not sharply circumscribed, may be used to undermine the statutorily imposed limitations."

In sum, the philosophical commonplace that every act has infinite, if subtle, ramifications, does not suffice to rescue Huffman's claim from the application of the statute of limitations.

For all of the foregoing reasons, the Court concludes that defendants are entitled to summary judgment with respect to plaintiff Huffman's single claim.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment is granted and the case and action therein are dismissed.

IT IS HEREBY FURTHER ORDERED that counsel for defendants shall promptly prepare an appropriate form of judgment, obtain approval of counsel for plaintiffs as to form, and submit it for execution by the Court.

---

4. Code of Civil Procedure § 338(1) prescribes a three-year statute of limitations for any action predicated "upon a liability created by statute, other than a penalty or forfeiture." Code of Civil Procedure § 343 prescribes a four-year statute of limitations in the case of actions not specifically provided for elsewhere.