**IOWA CIVIL RIGHTS COMMISSION,**
**Respondent-Appellant,**

v.

**WOODBURY COUNTY COMMUNITY**
**ACTION AGENCY,**
**Petitioner-Appellee.**

No. 2–64785.

Court of Appeals of Iowa.

Jan. 30, 1981.

Thomas J. Miller, Atty. Gen. of Iowa, and Scott H. Nichols, Asst. Atty. Gen., for respondent-appellant.

Patrick C. McCormick of Whicher, McCormick, Ford & Gurdin, Sioux City, for petitioner-appellee.

Heard by OXBERGER, C. J., and DONIELSON, SNELL, CARTER and JOHNSON, JJ.

JOHNSON, Judge.

Respondent-agency, Iowa Civil Rights Commission, appeals from district court's order on judicial review reversing the Commission's determination that petitioner-employer, Woodbury County Community Action Agency, discriminated against a potential job applicant on the basis of race. Respondent asserts its decision was supported by substantial evidence in the record. We affirm.

**I. Procedural Background.** On September 11, 1974, Linda Winston filed a complaint alleging that her employer, Woodbury County Community Action Agency, engaged in the following racially discriminatory actions: failure to post a notice of a new job position; failure to have black persons receive a memorandum about the job position; and failure to take an application from the man who was employed in the new position until after the man was hired.

Following hearing on Winston's complaint, the agency hearing officer found that the employer had violated section 601A.6(1)(a), The Code 1977 [sic], by utilizing a hiring practice having a discriminatory impact, that complainant Winston had met the four elements required to establish a prima facie case, that intent was not a required element, that the employer had failed to rebut complainant's prima facie case by proving either that its hiring practice was rational and neutral or that use of the hiring procedure was a business necessity, and that complainant was entitled to an award of back pay. The Iowa Civil Rights Commission adopted the recommended decision and order of the hearing officer. On the employer's application for judicial review, the district court reversed the Commission's decision. The district court found that the employer did not follow its established hiring practice, but that there was no credible evidence of race or sex discrimination in the record. Respondent Commission's appeal then followed.

■ **II. Scope of Review.** Our review of district court's order reversing the Commission's finding of employment discrimination based on race is at law. § 17A.20, The Code 1979; *Jackson County Public Hospital v. Public Employment Relations Board*, 280 N.W.2d 426, 429 (Iowa 1979); *City of Davenport v. Public Employment Relations Board*, 264 N.W.2d 307, 311 (Iowa 1978). In its exercise of section 17A.19 review powers, the district court acted in an appellate capacity to correct errors of law specified for contested cases in section 17A.19(8)(f). This court's review then is limited to the sole question of whether the district court correctly applied the law. To make that determination, we ask whether the agency action is supported by substantial evidence in the record before the agency when the record is viewed as a whole. § 17A.19(8)(f); *City of Des Moines v. Iowa State Commerce Commission*, 285 N.W.2d 12, 14 (Iowa 1979). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *City of Davenport*, 264 N.W.2d at 311. Evidence is substantial if a reasonable person would find it adequate for reaching a decision. *Id.* We are limited to the record made before the hearing officer. § 17A.19(7); *Farmers Elevator Company, Kingsley v. Manning*, 286 N.W.2d 174, 176 (Iowa 1979). If our conclusions are the same as district court's, affirmance is in order; if not, reversal may be required. *Jackson County*, 280 N.W.2d at 430.

**III. Agency's Findings of Facts.** Based upon our review of the record, we conclude there is substantial evidence to support the following relevant findings of fact. During the summer of 1974, a job program of petitioner-employer Woodbury County Community Action Agency (WCCAA) was being phased out; petitioner was negotiating with the Woodbury County Board of Supervisors and the director of the Comprehensive Employment Training Program (CETA), Bruce Lambertson, to have petitioner's job program absorbed by CETA. Contract negotiations were to be completed by August 26, 1974. Petitioner was to be responsible for filling seven positions, including Operations Supervisor. Lambertson, however, had approval and veto power over petitioner's selections and the power to dismiss individuals in the positions. During this same period of time, the Iowa State Employment Service (ISES) also was negotiating a contract with the Woodbury County Board of Supervisors to provide personnel for the CETA program, particularly for Development Counselors positions and the Operations Supervisor position. Petitioner perceived the ISES as having a different and unfavorable approach to the employ-

ment of low-income persons, thereby making it imperative that petitioner be able to select the person for Operations Supervisor.

John Woolridge,[1] then director of the Neighborhood Youth Corps Program, a part of petitioner's Manpower Program, was slated to move to the Operations Supervisor position when his Manpower Program position was absorbed by CETA. Shortly before this transition was to occur, Woolridge decided not to accept the Operations Supervisor position. Lambertson then informed petitioner through John Derby, petitioner's board chairperson, that the position would go to an ISES candidate if petitioner could not recommend a suitable candidate in the time remaining before the contract deadline. Chairperson Derby asked Lambertson if any of the current staff persons involved in petitioner's Manpower Program would be suitable; Lambertson said none would be suitable.

On August 16, 1974, Woolridge, Chairperson Derby, and Richard Crawford, petitioner's executive director, met in a "brainstorming" session to discuss the Operations Supervisor position. Kevin Beauvais, then a member of petitioner's board of directors, joined the meeting, whereupon his qualifications for and interest in the Operations Supervisor position were reviewed by the group. As a result, Beauvais was scheduled to interview with Lambertson on Monday, August 19th. Following the interview, Lambertson indicated to Crawford that Beauvais was an acceptable candidate.

On August 19th, Crawford, by letter, offered the Operations Supervisor position to Kevin Beauvais. The offer was conditioned on the contract being signed between petitioner and the Woodbury County Board of Supervisors. Beauvais accepted the position on August 23rd. The contract was signed on August 26th and, on the same date, Beauvais filled out an application form for the position. At Crawford's direction, Beauvais entered August 16, 1974, as the date of application.

On August 16th, Crawford dictated a memo announcing to the staff the Operations Supervisor position opening. The memo, which was not typed until August 19th, stated that applicants must have "a few of the following qualifications": 1) experience in supervision of staff; 2) experience in working with grant processing and some knowledge of Manpower Programs. The application deadline was Friday, August 23rd, 1974.

Complainant Linda Winston was employed in August of 1974 as Director of petitioner's Westside Center, located next door to the jobs program being phased out. During conversation with the jobs program staff, Winston learned that an opening for Operations Supervisor was forthcoming. Winston wanted to apply for this position.

By agency policy and practice, a memo was to be sent to all staff announcing available positions and hiring was done only after the closing date for applications. In this case the August 19th memo announcing the Operations Supervisor opening was not received by applicant Winston. One of petitioner's centers may have received it, but others did not. Nor was a public job notice posted.

Complainant Winston, learning that the position had been filled, then asked Crawford about the hiring practices. He informed her that hiring was not a concern of hers. Crawford subsequently asked his secretary to change the August 19th date on the letter to Beauvais, but the secretary refused. Various staff persons then asked Derby why notice of the opening was not given to all centers. Derby and Crawford exchanged angry words in Crawford's office over Crawford's offer of the position to Beauvais before the application deadline. Petitioner's Head Start Director, Janie Moeller, overheard this conversation. With the aid of Crawford's secretary and another person, she then copied the documents relating to the job opening, including the letter offering Beauvais the job, Beauvais' letter accepting the job, and Beauvais' ap-

---

1. We note that the record and briefs are in conflict as to the correct spelling. We are relying on the spelling of the name in the hearing officer's recommended order and decision.

plication. At that time, it was not known that Winston would file a civil rights complaint.

**IV. Employment Discrimination Theories.** We begin our analysis by clarifying the legal standard to be applied to complainant's claim.

■ Employment discrimination cases may involve either disparate treatment or disparate impact. *Geller v. Markham*, 481 F.Supp. 835, 837 (D.Conn.1979). The standards for disparate treatment claims are based on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973), while the standards for disparate impact claims stem from *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971). The two theories are defined in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), as follows:

> [D]isparate treatment is said to define a situation where "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." [citations omitted.] On the other hand a disparate impact situation is defined as one that "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."

*Wright v. National Archives & Records Service*, 609 F.2d 702, 711 (4th Cir. 1979) (quoting *Teamsters*, 431 U.S. at 335, 97 S.Ct. at 1854, 52 L.Ed.2d at 415 n.15).

■ In disparate treatment cases involving promotions, the plaintiff must carry the initial burden of establishing a prima facie case of racial discrimination by showing: 1) that (s)he belongs to a racial minority; 2) that (s)he applied and was qualified for a job for which the employer was seeking applicants; 3) that, despite his/her qualifications, (s)he was rejected; 4) that, after his/her rejection, the position remained open and the employer continued to seek applicants from persons with complainant's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

■ Once complainant establishes his or her prima facie case, the burden of going forward with evidence shifts to the employer to articulate "some legitimate, non-discriminatory reason" for the employer's rejection of complainant. *Ligons v. Bechtel Power Corp.*, 625 F.2d 771, 773 (8th Cir. 1980). The complainant then has the opportunity to prove that the employer's justification was a mere "pretext" for racial discrimination.[2] *Geller*, 481 F.Supp. at 837. This "... last determination essentially involves a question of motive." *Id.* at 838. If the plaintiff cannot demonstrate an improper motive, the claim cannot be established as plaintiff has failed to prove that a racially biased reason actually was the reason for the employer's action at issue. "The ultimate issue in a disparate treatment case under Title VII is whether the prohibited conduct—here ... [race]—was a *factor* in the challenged employment practice." *Satz v. ITT Financial Corp.*, 619 F.2d 738, 746 (8th Cir. 1980) (emphasis in original).

■ As an alternative to the *McDonnell Douglas* disparate treatment analysis, a plaintiff may establish a prima facie case of discrimination under *Griggs* by showing the disparate impact on a minority group of an employer's general policies, procedures or tests utilized in hiring, promotions, or discharges. *Geller*, 481 F.Supp. at 838. Disparate impact analysis has been utilized in numerous class action suits involving challenges to an employer's general policies or procedures. *Id.*, citing "[e]. g. *International Brotherhood of Teamsters v. United States*,

---

**2.** In *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216, 219 (1978), the Court stated that the burden of persuasion remains on the plaintiff throughout and that the burden on defendant is only to articulate some reason for his or her action. Unless the plaintiff presents evidence that the employer's reason is a pretext for discrimination, the defendant is entitled to a directed verdict. *Geller*, 481 F.Supp. at 837.

431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *cf. Loeb v. Textron, Inc.*, 699 F.2d 1003, 1017 (1st Cir. 1979) ('Supreme Court has held that a prima facie showing of discrimination can be made in a class action by showing discriminatory hiring patterns and practices.')." Proof of motive is not required. As stated by the court in *Geller*,

> [t]he reason for the distinction is obvious. In individualized cases, absent proof of a wrong motive, there is no basis for determining whether the race ... of the aggrieved employee affected the employer's decision. Thus there can be no showing of discrimination. In broader challenges to company policies, however, discrimination can be shown from statistics alone.

481 F.Supp. at 839. Under *Griggs*, once plaintiff makes out a prima facie case by showing disparate impact, the burden is shifted to defendant to show the " 'job-relatedness' " of the employer's practices or the " 'business necessity' " behind the policies. *Id.*

Since disparate treatment and disparate impact are alternative theories for evaluating employment discrimination claims, see *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978), we will analyze respondent's claims under both theories. We note that the hearing officer used the elements of the disparate treatment theory to find that claimant had established her prima facie case but then analyzed the employer's burden on rebuttal under the disparate impact theory. The district court found that, although the employer's customary employment procedures were not followed, there was no evidence of discrimination by reason of race or sex. This analysis appears to follow the disparate impact theory, although the court's judgment does not identify its theory of analysis.

While we agree with the district court's result, we further conclude that complainant has failed to carry her burden of proof under either theory. We first apply the disparate impact theory to the facts.[3]

**A. Disparate Impact Theory.** When considering race discrimination claims in promotional situations, such as those involving supervisory or managerial positions, we focus on discriminatory patterns or potentials for stereotyping employees on the basis of race. A claim is shown where supervisors subjectively make employment decisions without definite standards for review and a pattern clearly disfavoring minorities results. *Satz*, 619 F.2d at 746. This analysis is useful here as complainant Winston alleged that petitioner gave no notice of the new job position, that no black persons in the agency received a memorandum about the job vacancy, that no applications were taken for the job, and that the man hired did not complete an application until after he was hired. Complainant alleges that race was a factor in this process.

From the record we find that the hiring practices followed for the job opening at issue were not those prescribed by petitioner's adopted policies and procedures. This incident, however, was the only one established, or even alleged, wherein petitioner did not follow its regular procedures. The other evidence in the record introduced to support the claim of race discrimination involved prior promotions and supervisory hirings where no claim of improper procedure was alleged. In this regard, the hearing officer found that petitioner had a policy of hiring only black persons or persons related to black persons for the position of Westside Center Director and that no black persons were appointed to supervisory positions while Richard Crawford was petitioner's Executive Director. We find this evidence has no bearing on the practice at issue here where the employer went beyond the parameters of its established hiring practices.

**3.** According to the court in *Wright*, "[t]his may be the better order for courts in any case where both theories are advanced. A claimant's path after establishment of a prima facie case is considerably easier under the impact theory than under the treatment theory, and the same probably holds true for relative ease of proof analysis by courts. Economy of judicial effort thus suggests this order of analysis." 609 F.2d at 711, n.7.

■ In considering the only incident of improper practice at issue, we find that a single isolated incident is insufficient to state a claim of race discrimination. *Chatman v. United States Steel Corp.*, 425 F.Supp. 753, 758 (N.D.Cal.1977).[4]

> The policy or practice contemplated by disparate impact doctrine consists of "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts", having reference instead to an employer's "standard operating procedure—the regular rather than the unusual practice."

*Wright*, 609 F.2d at 712 (quoting *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855, 52 L.Ed.2d at 416 (defining "pattern or practice" in government action under section 707(a) of Title VII)).

In *Wright*, a black employee, advancing a claim solely on his own behalf, alleged a training program did not equip him for a promotion while it did equip a white employee. 609 F.2d at 712–13. The court declined to apply the disparate impact theory where the total set of affected persons was so small, the protected group was numerically dominant and the adverse "impact" was experienced by only one of the protected group. *Id.* at 712. The court noted that the purpose of the disparate impact theory was "... to ensure more perfect realization of the beneficent purposes of Title VII by making plain that discriminatory consequences ..." were also included under this remedial legislation. *Id.* at 713. The theory also provides a relatively easy burden of proof for a complainant and is to be applied with flexibility to carry out the Act's intent. The court warned against compromising the integrity of the disparate impact theory through "undisciplined extension" and found such would occur under the facts before it if a finding of discrimination were upheld.

In technical effect the result would be to find a disparate impact *prima facie* case established in any situation where a single white male employee has received an employment benefit—hiring, promotion, etc.—not received by comparably situated member of a protected group. This would cast upon the employer defendant the difficult business necessity defense rather than requiring of defendant the mere "articulation of a legitimate non-discriminatory reason" that could only be overcome by claimant's counterproof of pretext.... Disparate impact theory would thereby effectively swallow disparate treatment theory as an available method of establishing Title VII violation.

*Id.* n.11. The court therefore concluded that the evidence failed to establish a prima facie case of discrimination under the disparate impact theory. *Id.*

■ We find the court's analysis in *Wright* to be persuasive and conclude that a finding of disparate impact on the basis of the one isolated incident of alleged improper procedure and practice herein would be such an undisciplined extension. We find claimant has failed to establish a prima facie case under the disparate impact theory. As a result, no burden to rebut shifted to petitioner. We next turn to the question of whether claimant has proven racial discrimination under disparate treatment analysis.

**B. Disparate Treatment Theory.** Reviewing the evidence presented, we conclude that, even if claimant has established a prima facie case, she has not overcome the employer's articulation of a non-discriminatory explanation by proof that it was merely a "pretext" for racial discrimination. Thus claimant established no discriminatory intent.

---

4. "*See e. g., Robinson v. City of Dallas*, 514 F.2d 1271 [1273] (5th Cir. 1975), in which the court noted that 'three of the five employees disciplined under the "just debts" rule have been black. We are unable to conclude, on the basis of these few instances of discipline, that the "just debts" rule has a harsher effect on blacks than whites. Such small numbers are insufficient to support any conclusion as to whether the rule has a discriminatory effect.' " *Chatman*, 425 F.Supp. at 758, n.3.

■ Applying the *McDonnell Douglas* factors for proof of a prima facie case for failure to promote, we note that complainant Winston has demonstrated that she is black (element one). Element two requires a showing that claimant applied for the promotional position. Winston testified to being aware through the "grapevine" that an opening was forthcoming; she did not apply for the position nor did she do anything affirmatively to find out about the job opening until after she heard it was filled. She technically then did not satisfy element two and, consequently, elements three and four. We note, however, that where an employer's acts deter an employee from applying, strict adherence to the "application" requirement is not mandated. *See Alaska State Commission for Human Rights v. Yellow Cab*, 611 P.2d 487, 491 (Alaska 1980). *But cf. Peltier v. City of Fargo*, 396 F.Supp. 710, 722–23 (D.N.D. 1975), rev'd on other grounds, 533 F.2d 374 (8th Cir. 1976) (unsubstantiated rumor that employer discriminated does not excuse the formal application requirement). "Where a person seeking employment is effectively deterred by the discriminatory policy or conduct of the employer, the complaining party is not required to formally apply for the position in order to seek and obtain relief because of the discrimination." *Yellow Cab*, 611 P.2d at 491 (quoting *Banks v. Heun-Norwood*, 566 F.2d 1073, 1076 (8th Cir. 1977)). Nonetheless, complainant may not have done all she could have done towards applying for the position which she had heard would be available in the future. *See Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949, 57 L.Ed.2d at 967.

■ Element two also requires a showing of qualifications. Winston's qualifications for the position as viewed in the record show that she possibly could have been included in the group initially considered for the position. The hearing officer found that Winston had experience supervising staff (requirement one) and some knowl-

edge of Manpower Programs (one-half of requirement two). She did not have grant processing experience.[5]

■ Petitioner cited, as reasons for its actions, the short time frame in which to find a candidate acceptable to Lambertson, who had already found in-house staff unacceptable, including the white male executive director. Agency personnel also testified to preparing and distributing a memo announcing the job opening. Once petitioner carried its burden of producing evidence articulating a legitimate non-discriminatory reason for its actions, complainant then was required to produce evidence to show that the petitioner's actions were a pretext. This she has failed to do. We agree with district court that the record as a whole is devoid of any evidence indicating any discrimination against complainant on the basis of race. The proof against petitioner on the incident at issue shows only that the agency failed to follow its policies and procedures for hiring on this one occasion.

■ Respondent contends that, under Iowa law, proof of intent to discriminate is not required. Respondent relies on *Wilson-Sinclair Co. v. Griggs*, 211 N.W.2d 133, 140 (Iowa 1973), wherein the supreme court stated that "[o]ur legislation prohibits unfair employment practices without reference to motive, although motive is always a legitimate field of inquiry. A conscious course of practice which results in a 'built-in headwind' against minorities is surely as illegal as a practice motivated by a clear discriminatory intent." *Id.* at 140. There, a black employee on behalf of himself and his class alleged discrimination due to his employer's testing procedures. This allegation required application of the disparate impact theory where a showing of intent is not required. We note that while the Federal Act has no intent language, the federal cases interpreting the Act have found intent to be a required element only under

---

5. Even if the employer's failure to consider her application was a discriminatory act, petitioner was entitled to prove that Winston was not injured because she was not qualified and would not have been hired in any event. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 404–05, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453, 462 n.9 (1977).

disparate treatment. We believe the federal analysis is applicable as well to the Iowa Act which likewise has no intent language. This is consistent with *Wilson-Sinclair*, which is a disparate impact case. Here, under the disparate treatment analysis, we are convinced that we are required to determine intent after examining the elements of a prima facie case and the reasons offered by the employer for its acts. We thus find *Wilson-Sinclair* inapplicable and conclude that complainant failed to carry her burden of proof under the disparate treatment theory.

 Complainant therefore has failed to establish race discrimination under either theory. We agree with district court's finding that no substantial evidence of race discrimination has been shown in the record. We accordingly affirm that judgment.

AFFIRMED.