**DUBUQUE CITY ASSESSOR'S OFFICE, Appellant,**

v.

**DUBUQUE HUMAN RIGHTS COMMISSION, Appellee.**

No. 91–430.

Court of Appeals of Iowa.

Feb. 25, 1992.

Chadwyn D. Cox of Reynolds & Kenline, Dubuque, for appellant.

Matthew J. Devlin, Madison, Wis., for appellee.

Heard by OXBERGER, C.J., and SCHLEGEL and HABHAB, JJ.

HABHAB, Justice.

Victoria Klaren was a clerical employee of the Dubuque City Assessor's office. While holding her clerical job, she obtained some training in real estate appraisal. She · expressed interest in advancing to the position of appraiser if a vacancy arose.

The city assessor at times had more appraisal work than his full-time staff could perform. For this additional work the assessor hired part-time outside help. The outside help consisted of two male appraisers, both with considerable experience. Later, when a full-time appraiser position came open, a male with considerable experience was hired rather than Klaren.

Klaren challenged this practice by filing a complaint with the Dubuque Human Rights Commission. She alleged discrimination on the basis of sex. Artis Reis, the administrative law judge designated by the commission to conduct the hearing, found there was no discrimination and recommended the case be dismissed. In making this recommendation, the administrative law judge made thirty-four separate findings of fact. The proposed decision was scheduled for consideration by the commission at its May 14, 1990, meeting. At that meeting, a motion to reject the proposed decision failed on a 4–4 vote. The matter was again considered at a commission meeting.

At the second meeting and on a 4–3 vote, the commission adopted as its own findings all but two (paragraphs 27 and 28) of the administrative law judge's ruling. It adopted a substantial part of the judge's conclusions of law, but contrary to the recommendations of the administrative law judge, it found that "disparate impact" dis-

crimination had occurred.[1]

The city assessor's office appealed to the district court. The district court affirmed by holding there was disparate impact discrimination. Like the administrative law judge and the Human Rights Commission, the district court found there was no individual discrimination. It held that there was disparate impact discrimination.

## I. *Standard of Review.*

▆▆ The scope of review in cases arising out of the Iowa Administrative Procedures Act is limited to the corrections of errors at law. *Foods, Inc. v. Iowa Civil Rights Comm'n,* 318 N.W.2d 162, 165 (Iowa 1982). A district court decision rendered in an appellate capacity is reviewed to determine whether the district court correctly applied the law. *Id.* To make that determination this court applies the standards of section 17A.19(8) to the agency action to determine whether our conclusions are the same as the district court's. *Jackson County Public Hospital v. Public Employment Relations Board,* 280 N.W.2d 426, 429–30 (Iowa 1979). The scope of review encompasses a review of the entire record and is not limited to the agency's findings. *Higgins v. Iowa Dept. of Job Service,* 350 N.W.2d 187, 191 (Iowa 1984).

▆▆ Iowa Code section 17A.19(8)(f) provides in a contested case the court shall grant relief from an agency decision which is unsupported by substantial evidence made before the agency when that record is viewed as a whole. *Eaton v. Iowa Dept. of Job Service,* 376 N.W.2d 915, 916–17 (Iowa App.1985). Evidence is substantial to support an agency's decision when a reasonable person would find it adequate to reach a conclusion. *Id.* at 917. The question is not whether the evidence might support a different finding but whether the evidence supports the findings actually made. *Henry v. Iowa Dept. of Job Service,* 391 N.W.2d 731, 734 (Iowa App.1986). The fact that two inconsistent conclusions can be drawn from the evidence does not mean that one of those conclusions is unsupported by substantial evidence. *Id.*

## II. *Theories of Discrimination.*

We have reviewed the parties' arguments in this case. The essence of defendant Dubuque City Assessor's office appeal is the finding of disparate impact discrimination by the Dubuque Civil Rights Commission is not supported by substantial evidence in the record. As noted earlier, the commission and the district court found Klaren had not been subjected to disparate treatment.

The Iowa Supreme Court recently reviewed in detail the criteria for showing discrimination. *Hy–Vee Food Stores v. Iowa Civil Rights Commission,* 453 N.W.2d 512, 516–19 (Iowa 1990). We note only the highlights as they pertain to this case.

▆▆ There are two separate theories to show discrimination. One is disparate treatment,[2] wherein the employee seeks to show individual discrimination on the basis of race, color, religion, sex, or national origin. *Id.* at 516. Proof of motivation is critical. *Id.* The employee must establish a prima facie case of intentional discrimination by a preponderance of the evidence. A prima facie case is established by a showing that (1) the employee belongs to a protected group, (2) the employee is qualified for the position, and (3) after rejection, the employer continued to seek applicants with similar qualifications. *Id.*

Disparate impact is the second theory to show discrimination in the work place. The first stage of three stages requires the employee:

> show that a particular employment practice has an adverse impact on a protected group in "marked disproportion to its impact on employees outside the group."

---

1. The hearing officer and the Human Rights Commission, however, found that Klaren had not been subjected to disparate treatment, i.e. individual discrimination on the basis of race, sex, color, religion, or national origin.

2. Because of the finding that disparate treatment did not exist, we set forth briefly only the first stage of that treatment's analysis. For the other two stages, see pages 516 and 517 of the *Hy–Vee* case.

This stage depends almost entirely on statistical evidence. According to one commentator, this stage

> often requires voluminous discovery, thorough and detailed analysis of the employer's total organization and operation, and expert testimony by statisticians, industrial psychologists, and personnel managers. The statistical comparison must be valid in terms of significance (based on a sample large enough to yield reliable results), scope (covering an appropriate category of employees), and time (covering an appropriate length of time).

*Id.* at 517 (citations omitted).

The complainant has a further burden. In disparate impact cases, the complainant "is ... responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733, 751 (1989) (quoted in *Equal Employment Opportunity Commission v. Chicago Miniature Lamp*, 947 F.2d 292, 305 (7th Cir. 1991)). Like the disparate treatment theory in pretext cases, the burden of persuasion in a disparate impact case now rests with the employee in all three stages of proof. *Hy–Vee*, 453 N.W.2d at 518–19.

In summary, the disparate treatment theory focuses on the employer's motivation; the disparate impact theory focuses on the consequences of the employer's conduct. *Hy–Vee*, 453 N.W.2d at 516.

### III. *The Evidence.*

We set forth the facts as gleaned from the record. We are mindful that we only look to see if the commission's decision is supported by substantial evidence in the record.

A. *Statistical Evidence.* Klaren does not claim she was specifically singled out for discriminatory treatment by her employer. Rather, she claims women as a group are excluded from appraiser positions in the Dubuque City Assessor's Office, and she has been affected by this exclusion. This is known as disparate impact discrimination. Klaren utilizes statistical evidence of the assessor's hiring practices and workforce composition to support her claim.

The United States Supreme Court has recently discussed statistical proof to show disparate impact in employment practices. *Wards Cove Packing Co. v. Antonio*, 490 U.S. at 650–55, 109 S.Ct. at 2121–24, 104 L.Ed.2d at 747–50; *see also Chicago Miniature Lamp*, 947 F.2d at 297–305. The Iowa Supreme Court extensively reviewed *Wards Cove* in *Hy–Vee v. Iowa Civil Rights Commission*, 453 N.W.2d at 518–19.

In *Wards Cove*, cannery workers at two Alaskan fish canneries brought a discrimination suit premised on the employer's alleged racially discriminatory hiring practices. 490 U.S. at 645–48, 109 S.Ct. at 2119–20, 104 L.Ed.2d at 744–45. The main evidence supporting their claim was the statistical racial disparity between the cannery workers and the higher-paid noncannery workers. *Id.*

The Ninth Circuit United States Court of Appeals' decision reversed a district court ruling for the employer-defendants. *Id.*, 490 U.S. at 648–49, 109 S.Ct. at 2120, 104 L.Ed.2d at 746. The Supreme Court reversed the court of appeals. In reversing, the Supreme Court held, under the facts, mere statistical disparity was insufficient to show discriminatory treatment. *Id.*, 490 U.S. at 651–55, 109 S.Ct. at 2121–24, 104 L.Ed.2d at 748–50. It explained that, given the potential labor pool of applicants, the statistical racial imbalance merely reflected the different geographical and demographical areas from which the respective workers were drawn. *Id.*, 490 U.S. at 653–55, 109 S.Ct. at 2122–24, 104 L.Ed.2d at 749–50. We set out the pertinent portion of *Wards Cove:*

> In holding that respondents had made out a prima facie case of disparate impact, the Court of Appeals relied solely on respondents' statistics showing a high percentage of non-white workers in the cannery jobs and a low percentage of such workers in the noncannery positions. Although statistical proof can alone make out a prima facie case, the Court of Appeals' ruling here misappre-

hends our precedents and the purposes of Title VII, and we therefore reverse. ... It is such a comparison—between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs—that generally forms the proper basis for the initial inquiry in a disparate-impact case. Alternatively, in cases where such labor market statistics will be difficult if not impossible to ascertain, we have recognized that certain other statistics—such as measures indicating the racial composition of "otherwise-qualified applicants" for at-issue jobs—are equally probative for this purpose.

... [T]he Court of Appeals' acceptance of the comparison between the racial composition of the cannery work force and that of the noncannery work force, as probative of a prima facie case of disparate impact ..., was flawed.... Most obviously, ..., the cannery work force in no way reflected "the pool of *qualified* job applicants" or the *"qualified* population in the labor force." Measuring alleged discrimination in the selection of accountants, managers, boat captains, electricians, doctors, and engineers—and the long list of other "skilled" noncannery positions ...—by comparing the number of nonwhites occupying these jobs to the number of nonwhites filling cannery worker positions is nonsensical. If the absence of minorities holding such skilled positions is due to a dearth of qualified nonwhite applicants (for reasons that are not petitioners' fault), petitioners' selection methods or employment practices cannot be said to have had a "disparate impact" on nonwhites.

... [U]nder the Court of Appeals' theory, simply because nonwhites comprise 52% of the cannery workers at the cannery in question, respondents would be successful in establishing a prima facie case of racial discrimination under Title VII. Such a result cannot be squared with our cases or with the goals behind the statute. ... The only practicable option [to expensive, time consuming litigation] for many employers would be to adopt racial quotas, ...; this is a result that Congress expressly rejected in drafting Title VII.....

... As long as there are no barriers or practices deterring qualified nonwhites from applying for noncannery positions, if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities. Where this is the case, the percentage of nonwhite workers found in other positions in the employer's labor force is irrelevant to the question of a prima facie statistical case of disparate impact.... [A] contrary ruling on this point would almost inexorably lead to the use of numerical quotas in the workplace, a result that Congress and this Court have rejected repeatedly in the past.

Moreover, isolating the cannery workers as the potential "labor force" for unskilled noncannery positions is at once both too broad and too narrow in its focus. It is too broad because the vast majority of these cannery workers did not seek jobs in unskilled noncannery positions; there is no showing that many of them would have done so even if none of the arguably "deterring" practices existed. Thus, the pool of cannery workers cannot be used as a surrogate for the class of qualified job applicants because it contains many persons who have not (and would not) be noncannery job applicants. Conversely, if respondents propose to use the cannery workers for comparison purposes because they represent the "qualified labor population" generally, the group is too narrow because there are obviously many qualified persons in the labor market for noncannery jobs who are not cannery workers.

*Wards Cove,* 490 U.S. at 650–55, 109 S.Ct. at 2120–24, 104 L.Ed.2d at 747–50 (citations omitted).

■ After reviewing the facts of this case, we are convinced it falls within the rationale outlined by Justice White in his

majority opinion in *Wards Cove.* Primarily, we note the main and indeed the only evidence purporting to show the discriminatory treatment of Klaren is statistical. She claims the relevant labor pool is approximately 50% male and 50% female. In the last thirty years, apparently no female has been hired as an appraiser for the Dubuque city appraiser's office. All the clerical help in the office is female.

However, the pertinent statistical base, known as the relevant labor market, is determined at least in part by *the number of applicants for the job. Id.,* 490 U.S. at 650–52, 109 S.Ct. at 2122–23, 104 L.Ed.2d at 747–48; *Chicago Miniature Lamp,* 947 F.2d at 295. The statistical proof here does not show disparate treatment between male and female *applicants* for appraiser positions.

The record shows beyond dispute there has been only one female applicant for an appraiser's position in the past thirty years. The only female applicant in that thirty-year period is the complainant here. Unlike *Hy–Vee v. Iowa Civil Rights Commission,* due to the dearth of female applicants for appraiser positions, the statistical disparity is insufficient to create a prima facie case of discrimination. *See* 453 N.W.2d at 517, 520–21.

Further, Klaren complains the gender division caused males to be channeled into appraiser positions, while females were limited to lower-paying clerical positions. However, nowhere in the record does there appear to be any statistics regarding the number of *male applicants* who have been rejected for *clerical positions* by the appraiser's office.

Finally, we note the Dubuque Human Rights Commission hearing officer recommended Klaren's case be dismissed. The commission overturned the hearing officer's recommendation of dismissal. It found instead Klaren had presented a viable gender discrimination claim.

As in *Wards Cove,* the mere statistical disparity between the overall workforce and the number of females actually hired does not create the necessary prima facie case of gender discrimination necessary for the case to go forward. Based upon the statistical evidence of only one female applicant for appraiser positions over the past thirty years, the evidence does not support a finding of disparate impact. To hold otherwise, under the present record, would obligate employers to utilize a quota system in hiring based on gender. Such a quota system was specifically rejected by the United States Congress and the Supreme Court. *Id.,* 490 U.S. at 652, 109 S.Ct. at 2122, 104 L.Ed.2d at 748–49.

■ *B. Specific Employment Practices.* In disparate impact cases, the complainant "is ... responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Chicago Miniature Lamp,* 947 F.2d at 305 (quoting *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124, 104 L.Ed.2d at 751). On the outset of our examination of this issue, we note Klaren is the first woman to apply for an appraiser position at the city assessor's office in the past thirty years. All her training in the field has been paid for by the city assessor's office. Additionally, she received her regular full-time pay while attending the appraiser educational courses. Further, she has little appraiser experience, and no experience other than what she has gained at the city assessor's office.

The vacant position for which she applied required a person qualified as an "appraiser III." This qualification apparently required some commercial appraising experience. Klaren was only qualified as an "appraiser I," or an entry-level appraiser with no commercial experience.

The attorney representing Klaren's interest stated on the record that Klaren conceded the new appraiser was more qualified than she was. The attorney went on to state the real thrust of Klaren's complaint was the head of the city assessor's office, Frank Frost, had not given Klaren adequate training so she could compete on an equal footing with the person actually hired. Both the commission and the district court found there was no disparate

treatment. Klaren has not appealed from this finding.

Klaren basically complains she should have been hired for the city's assessor's part-time work prior to the time when the appraiser III position came open. Instead, the city assessor's office hired two males to help with part-time work. Klaren admits and the commission found she would not have been qualified for the appraiser III position even if she had rudimentary appraisal experience.

The record reveals the assessor's office did hire two males part-time. The record also reveals the part-time help had extensive experience. One was an assessor who had recently retired from the assessor's office. This person did the bulk of the part-time assessor work, as well as some other office duties. The record shows he was paid only a few thousand dollars a year, depending on the amount of work performed.

The other part-time person was only hired once. He assisted the city in doing an extensive re-evaluation to avoid a state-mandated recomputation of the assessment formula. There is evidence in the record an experienced commercial appraiser was required for this job.

The commission and the district court found it would have been more cost effective to hire Klaren rather than outside help for the part-time appraisal work. However, the district court conceded there was no direct evidence on this issue. Rather, the district court stated such conclusion can reasonably be drawn from the record.

Klaren was a full-time clerk at the assessor's office. For her to do appraisal work, she would have to take time off from her clerk job. Consequently, the office presumably would either be short-handed or would have to hire someone else to fill in for Klaren while she was out getting experience.

Additionally, if Klaren was to do field appraisal work, someone would have to be on hand to train her. As both part-time appraisers had extensive experience, such on-the-spot training and supervision does not appear to have been necessary. The

full-time assessor only had to review their work.

In the absence of any direct evidence to the contrary, we determine the record does not support a finding it would have been more cost effective for the city assessor to hire Klaren instead of outside help to do part-time appraisal work. Even if the record did support such an inference, we doubt that fact would show discriminatory intent by the assessor's office.

Further, the evidence reflects, and the commission found, the present city assessor has worked to advance training of his clerical employees far more than any of his predecessors. The chief assessor has held his position since 1980. He arranged for appraisal education and training of several persons in his office, including the female clerical staff. He arranged for Klaren's and the other workers' training at city expense. He also saw they received regular full-time pay while at the training sessions. Further, apparently the city assessor had given Klaren opportunities to do such tasks as equipment appraisals.

We determine Klaren and the commission have failed to carry their burden of proof to show specific practices by the employer which created the disparate impact. We reverse the district court and commission on this issue.

### IV. *Conclusion.*

We determine the commission's finding of disparate impact discrimination is not supported by substantial evidence. Klaren has admitted the appraiser hired was more qualified than she was.

The statistical evidence of the relevant labor pool shows there has been only one female applicant for an appraiser position in the past thirty years. That applicant is the complainant here. Nor is there evidence of any male who was rejected for clerical positions allegedly assigned exclusively to females. The statistical evidence here does not show a prima facie case of disparate impact on gender. We determine the commission's findings on this issue are not supported by substantial evidence. We reverse on this issue.

Klaren and the commission point to no particular discriminatory practices of her employer. The factual evidence shows the chief city assessor has done much to advance the training of the female clerical staff and prepare them for possible appraiser positions. Klaren has received extensive assessor training in her present position, at city expense and with the support of her superiors. No direct evidence shows it would have been more cost effective to hire the female clerical staff as part-time appraisers rather than the more experienced and better-qualified male appraisers. Klaren and the commission have not carried their burden to show particular practices by the city assessor's office which caused the alleged disparate impact. We determine the commission's findings on this issue are not supported by substantial evidence. We reverse on this issue.

Due to our ruling in this case, we vacate the award of attorney fees to the commission's privately-retained attorney.

We reverse and vacate the district court's ruling upholding the civil rights commission's finding of gender discrimination by disparate impact. We accordingly reverse the commission's order and remand this case back to the commission with directions that the complaint be dismissed.

Although we have been unable to find discrimination by disparate impact, we note the Dubuque Human Rights Commission made several recommendations to the city assessor's office. The recommendations outlined possible actions to promote more women into appraiser positions. The commission did not mandate the implementation of these measures, and we are without authority under this record to do so. However, we strongly urge the city assessor's office to carry out these and other measures to promote the goal of a gender-neutral workforce.

**REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.**

SCHLEGEL, J., concurs.

OXBERGER, C.J., dissents.

OXBERGER, Chief Judge (dissenting).

I respectfully dissent. The majority focuses on the number of applicants for the job as appraiser. They conclude that because no woman has ever applied for the job of appraiser, that the failure to hire any female for that position is not disparate impact.

The majority does not discuss the following trial court finding:

The record also reflects that the official registers maintained by the State of persons qualified to hold the position of appraiser are more than fifty percent women.

I would hold that the pertinent statistical base for determining the relevant labor market is not the number of applicants for the job but the eligible list of persons qualified to hold the position of appraiser.

I find the failure of the city assessor to hire one female appraiser when the eligible pool of applicants is fifty percent female establishes disparate impact. Employment discrimination is no less because the employer's discriminatory practices focus on the process before he or she receives applications. I would affirm the trial court.